# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 17, 2011

## STATE OF TENNESSEE v. BOBBY JOE YOUNG, JR.

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40801224     Michael R. Jones, Judge**

**No. M2010-01531-CCA-R3-CD - Filed December 14, 2011**

A Montgomery County jury convicted the defendant, Bobby Joe Young, Jr., of aggravated assault, a Class C felony. The trial court sentenced him, as a multiple offender, to serve six years in the Tennessee Department of Correction. On appeal, the defendant argues that the evidence was insufficient to sustain his conviction. Following a review of the parties' briefs, the record, and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined. JUDGE J.C. MCLIN was originally on the panel to which this case was assigned. Judge McLin died September 3, 2011, and we acknowledge his faithful service to this Court.

Chelsea Nicholson (on appeal), Nashville, Tennessee, and Jeffrey Grimes (at trial), Clarksville, Tennessee, for the appellant, Bobby Joe Young, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Helen Young, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Montgomery County grand jury indicted the defendant, Bobby Joe Young, Jr., for two counts of aggravated assault and one count of public intoxication. Before the court's empaneling of the jury, the state moved to dismiss the public intoxication count. The court held a trial for the remaining two counts at which the parties presented the following evidence.

Terry Garske testified that he was an employee of the Night Deposit Sports Bar in Clarksville, Tennessee. He was there with his girlfriend, Steve Huff, John King, and others on the evening of June 13, 2008; however, he was not working that night. Garske did not know the defendant before he saw him at the Night Deposit with his girlfriend that night. The defendant's girlfriend, Vivian Vasquez-Adkins, approached Garske and "bummed a cigarette" from him. They began talking, and the defendant became jealous that Vasquez-Adkins was talking to Garske. The defendant approached Garske and started a confrontation. Garske told the defendant, who seemed to have been drinking, that he was just trying to have a good time with his own girlfriend and was not trying to start an altercation.

Security guards stepped in to diffuse the situation, and security guard Charlie Wright escorted the defendant outside the building. Wright followed the defendant telling him to get out, but did not touch the defendant. Wright kept his distance from the defendant but continued to follow him to the door so that he could not re-enter the Night Deposit. Garske could not hear anything the defendant said because he was trying to pay attention to his girlfriend with whom Vasquez-Adkins began arguing. Vasquez-Adkins "seemed like she was pretty drunk" and was mad because the security guards were kicking her and the defendant out of the club. Garske did not see anyone swing a pool cue at or threaten the defendant.

Garske heard that the defendant and Vasquez-Adkins were headed in the direction of Jackson's Body Shop. Garske went to Jackson's Body Shop with King who owned the business and wanted to check on his property. When he arrived, Garske observed Vasquez-Adkins hanging out of a parked vehicle that belonged to a customer. Garske and King told Vasquez-Adkins that she needed to get out of the vehicle and off the property. Garske and the defendant did not see each other until the defendant walked from behind the building toward King with a knife in his hand. Eventually the defendant and Vasquez-Adkins left the property. Garske did not see anyone with pool cues at the auto body shop and only saw people telling the defendant to get off the property. The defendant did not have permission to be at Jackson's Body Shop, which was closed when this incident occurred, nor did he have permission to enter any of the vehicles on the property.

Charlie Wright testified that he was working as a security guard at the Night Deposit on June 13, 2008. Wright did not know defendant before seeing him the night of June 13. The defendant entered the Night Deposit between 7:30 and 7:45 p.m. Wright noticed that the defendant, who came in with another man and two women, was "highly intoxicated." The defendant began acting belligerently with another customer at the Night Deposit, and Wright asked him to leave. One woman with the defendant was also intoxicated and acting belligerently, but the other man and woman were not causing any problems. Security did not ask the other people to leave and were trying to calm down the defendant and get him out of the Night Deposit.

-2-

After Wright told the defendant that he had to leave the Night Deposit, the defendant began walking out of the building. As the defendant walked out he began screaming obscenities and cussing. Wright walked the defendant to the door and stayed about five feet away from him while doing so. After the defendant exited the Night Deposit, Wright closed the door. Wright opened the door when new customers came to the establishment and saw that the defendant was still standing at the door. No customers followed, touched, or threatened the defendant as he left the Night Deposit.

Wright stepped outside the Night Deposit to ask the defendant to leave the property, and the defendant pulled out a knife and flipped it open. The defendant walked backwards toward the end of the building with Wright following within ten feet to make sure that he left the property. When the defendant got to the end of the building, he took off toward Jackson's Auto Body. Wright identified a knife that was "more or less" the knife that the defendant had that night. The knife was distinguishable because it had a broken handle. Wright observed that the defendant's knife had a broken handle when the defendant flipped the knife open a second time and dropped the knife.

Wright felt that the defendant posed a threat to him and the customers who were entering and exiting the Night Deposit. Wright, who did not have a weapon in his possession that night, called the police and waited for their arrival. Wright did not see the defendant again until Officer Ortiz brought him to the Night Deposit so that Wright could identify him.

John King, the owner of Jackson's Auto Body, did not know the defendant before seeing him at the Night Deposit on June 13, 2008. King knew Vasquez-Adkins because her father had worked for him. King had fired Vasquez-Adkins's father a couple weeks before the incident at the Night Deposit. He observed an altercation at the front of the Night Deposit that involved loud talking, and he also observed Wright escorting the defendant and Vasquez-Adkins out of the building. King did not see anyone following them as Wright escorted them out of the building nor did he see what occurred in the parking lot.

King had been to the Night Deposit on a few occasions when Wright was working. He said the defendant had to have been "acting up" for Wright to ask him to leave. King had never seen Wright use excessive force with anyone. He was not around the altercation, but he did see Wright use the arm gesture that he had always used to indicate that a patron had to leave.

After the altercation had cooled down, King walked outside and saw Wright and two women coming from around the building. One of the women was Garske's girlfriend. They told him that the defendant and Vasquez-Adkins had left in the direction of his body shop. King decided to go check on the body shop because the shop had many burglaries, and he

was concerned because of Vasquez-Adkins's past. He was not pursuing the defendant when he went to the body shop and only went to the shop to ensure that his shop was secure.

When King got to the body shop, he saw Vasquez-Adkins's "hind end sticking up out of a car[.]" She appeared to be pilfering through the car, and King hollered for her to get out of the car. King was loud when he yelled for Vasquez-Adkins to get out of the car because he initially did not know who she was and thought she was someone breaking into one of his vehicles. King denied that he had a temper and history of violence.

The defendant came from behind the body shop and approached King with something in his hand. When the defendant got closer, King saw that it was a knife and went to the front of the building to call the police. The defendant did not go after King when he went to call the police. King did not know what the defendant was doing behind the body shop but did not find any evidence that he was doing anything wrong. King had intended for the police to arrest her and not the defendant.

King was fearful when he saw the defendant with the knife because he did not know the defendant. He did not know what the defendant might have done because the defendant appeared to be intoxicated. Neither King nor Garske had pool cues, but King had a pocket knife deep in his pocket. King had not pulled his knife out of his pocket and had not threatened the defendant when the defendant approached him with a knife.

Steven Allen Huff, an employee at Jackson's Body Shop, had never met the defendant before June 13, 2008. Huff went to Jackson's Body Shop around 8:30 p.m. that evening. Huff had been at an apartment behind the Night Deposit when his ex-girlfriend called and told him that he needed to go to the shop because an argument was going on there. When Huff got to the body shop, he saw King, Garske, and a few other people there. He did not know if the people at the body shop had come from the Night Deposit. Huff did not see the defendant until someone told him that the defendant and Vasquez-Adkins had gotten into his car. Huff had left his keys in his car, so he went back to it and saw the defendant in the passenger seat trying to stick something under the seat. Huff grabbed the defendant by his arm and saw a knife in his hand. Huff snatched the knife out of the defendant's hand, and when the police officers arrived at the scene, Huff gave them the knife. According to Huff, he drove Vasquez-Adkins home after the police arrested the defendant.

Christina Harris, an officer with the Clarksville Police Department, answered a call on June 13, 2008, regarding a man with a knife at the Night Deposit. When she arrived at the Night Deposit, the suspect was no longer there. Witnesses told her that the suspect was at Jackson's Auto Body, so she did not get out of her vehicle. She did not see "an angry mob" outside the Night Deposit, but there was a small crowd outside Jackson's Body Shop when she arrived. Huff handed Officer Harris a knife, and she placed the knife on the hood

of her vehicle. After Officer Tomas Ortiz arrived and secured the defendant, Officer Harris gave Officer Ortiz the knife. Officer Harris did not recall speaking with the defendant or Vasquez-Adkins. She did not recall the defendant claiming that the group of people had threatened or assaulted him.

Officer Tomas Ortiz, of the Clarksville Police Department, spoke with Wright when he arrived at the Night Deposit. Wright did not seem angry or upset and told Officer Ortiz that a man had pulled a knife on him. He told Officer Ortiz that the suspect had gone down Jefferson Street to the bottom of the hill and Officer Ortiz directed Officer Harris to go in that direction.

When Officer Ortiz arrived where the defendant was, he saw three to five people. The people were not carrying anything and they did not seem like a small mob according to Officer Ortiz. Officer Ortiz asked the defendant to step out of the car in which he was sitting and told him that he was arresting him for assault. After Officer Ortiz placed the defendant in the police vehicle, he put the knife in an evidence bag, sealed it, and placed it in the police vehicle. Officer Ortiz drove the defendant back to the Night Deposit, and Wright identified the defendant as the person whom he had ejected from the Night Deposit. The defendant did not tell Officer Ortiz that anyone had assaulted, threatened, or attacked him or Vasquez-Adkins.

Vivian Vasquez-Adkins testified that the defendant was her ex-boyfriend. She and the defendant had been at a friend's house when they decided to go to the Night Deposit. They had already been drinking before they arrived at the Night Deposit. When they got there, they began playing pool. Vasquez-Adkins began "arguing with this man that was trying to hit on [her], and [she] told him not to talk to [her] because [she had] an old man; and he said F your old man, and [she] proceeded to argue with him." Vasquez-Adkins also began arguing with Wright. While she was arguing with them, the defendant was in the background. She eventually saw security telling the defendant to leave. Vasquez-Adkins went outside approximately ten minutes after security removed the defendant.

When Vasquez-Adkins went outside, the defendant was in the car with the people with whom they had come to the Night Deposit. The driver would not allow Vasquez-Adkins or the defendant to ride home with them, so they got out of the car and began to walk. About ten of the people with whom Vasquez-Adkins had been arguing came outside with pool sticks and began following and cursing at them. The defendant was trying to get Vasquez-Adkins away from the scene when he pulled out a knife. The people stopped following them after the defendant pulled out his knife, and the defendant and Vasquez-Adkins continued to walk away.

After they had left the Night Deposit, the defendant was upset with Vasquez-Adkins and blamed her for the altercation. They noticed that the people from the Night Deposit were following them, and they began running toward Jackson's Body Shop. When they got there, Huff had pulled up and Vasquez-Adkins asked him to drive them home. The only threat made toward Vasquez-Adkins while at the body shop was Huff saying, "get that f***** b**** out of here before I f***** whoop her."

On cross-examination, Vasquez-Adkins testified that she had drunk a pint of vodka that day. She believed that the incident occurred around 1:00 a.m. and she said that it was not raining. Vasquez-Adkins had been to the Night Deposit before, and she had taken the defendant there for the first time on the night of the incident. Neither she nor the defendant knew Wright before that night, and Vasquez-Adkins had not had any previous problems at the Night Deposit. Vasquez-Adkins began arguing with a woman who she believed was Wright's girlfriend after she had argued with Wright. She did not know Garske and said she had no idea why he would have testified that she had argued with his girlfriend. Vasquez-Adkins was arguing when Wright escorted the defendant outside and did not know what happened outside the Night Deposit.

Vasquez-Adkins did not understand why King was being "so mean" to her while they were at the body shop. She denied pilfering through a car on the lot and said that she was in Huff's car. She denied that the defendant came from behind the building with a knife. Furthermore, she denied that there was a crowd of people standing around the body shop before the police arrested the defendant.

The defendant, Bobby Joe Young, Jr., testified that he had drunk two mixed drinks before going to the Night Deposit. At the Night Deposit, the defendant and his friends had ordered a couple of beers and began playing pool when Vasquez-Adkins began arguing with Garske's girlfriend. Garske went to where the women were arguing, and the defendant told him to leave them alone because "he was acting like he was going to put his hands on [Vasquez-Adkins]." The defendant had pulled Vasquez-Adkins back and was attempting to restrain her from fighting when Wright came over and grabbed the defendant. The defendant told Wright that he would leave and asked Wright to not put his hands on him. Wright grabbed Vasquez-Adkins by her arm, and the defendant shoved his hand off her. The defendant exited the Night Deposit, but Vasquez-Adkins remained inside arguing.

After he left the Night Deposit, the defendant walked to the left side of the building. The defendant encountered some people in an alley and turned around to avoid them. When he turned around, Wright was behind him. Wright told the people in the alley that he had just thrown the defendant out of the Night Deposit. The people in the alley began telling the defendant to get away from the Night Deposit. The people outside and Wright were walking toward the defendant so the defendant pulled out his knife. The defendant dropped his knife

when he pulled it out, and after he picked it up, he opened it because he thought they were about to "mob" him.

The defendant was afraid and tried to find the car in which he had ridden to the Night Deposit. Vasquez-Adkins came outside, and the defendant grabbed her. While they were outside, men were arguing with the defendant and women arguing with Vasquez-Adkins. The defendant thought there was a "big mass destruction fixing to happen" and that he and Vasquez-Adkins were in danger.

The defendant and Vasquez-Adkins left the Night Deposit and headed toward Jackson's Body Shop. Vasquez-Adkins told the defendant that her father used to work at the body shop and that Huff would give them a ride home or allow them to use the phone. Wright along with approximately four other men followed them to the body shop. When they got to the shop, Vasquez-Adkins went around one side of the building, and the defendant went to the entrance, which was behind the building, and knocked on the door. No one answered the door so the defendant went back to the front of the building.

The defendant and Vasquez-Adkins got into Huff's car. While they were in Huff's car, King approached the vehicle and began to curse at Vasquez-Adkins. The defendant got out of the car because he did not know who King was, and he thought that King was with the group with whom they had been arguing. Huff told the defendant to get back inside of the car because he knew King. Huff asked the defendant for his knife, and the defendant handed it to him.

The defendant did not intend to hurt anyone and was trying to protect himself and Vasquez-Adkins. He had previously been assaulted and had been hurt in a fight with several unarmed people. The previous group of people injured him to the point where he could not see for fifteen minutes, and he thought that the group of people from the Night Deposit could also inflict injuries on him.

On cross-examination, the defendant testified that he had been assaulted plenty of times but did not provoke fights. The defendant did not go straight to the vehicle in which he had ridden to the Night Deposit because he did not want to leave Vasquez-Adkins in there alone. The defendant initially said that Wright was the leader of the crowd that pursued him and Vasquez-Adkins to the body shop, but he later stated that he was unsure whether Wright was at the body shop. The defendant left the person with whom they had ridden to the Night Deposit because the group was chasing him. He said that no one ever told him that he and Vasquez-Adkins were not getting a ride home. The defendant did not tell the police that a group of people from the Night Deposit had chased them and attempted to assault them. When asked about Vasquez-Adkins's testimony that she did not see King until the police came and his conflicting testimony that King had cursed at Vasquez-Adkins while they were

in Huff's car, the defendant said that Vasquez-Adkins was drunk. The defendant denied that he was intoxicated during the incident and said that he only "had a good buzz."

After hearing the evidence, the jury found the defendant guilty as to count 1, the aggravated assault of Wright, but found him not guilty as to count 2, the aggravated assault of King. The trial court sentenced him, as a multiple offender, to serve six years in the Tennessee Department of Correction. The defendant timely appealed his conviction.

## Analysis

On appeal, the defendant argues that the evidence was insufficient to convict him because he did not have the requisite intent to commit an assault and the danger to Wright was not imminent. The defendant asserts that he did not display the knife until he was in a defensive retreat, and thus, his purpose was not to hurt anyone, and Wright was not within the zone of danger. The state contends that the defendant's self defense claim was not credible, the "zone of danger" theory is inapplicable to aggravated assault, and the evidence is sufficient to support the defendant's conviction. We agree with the state.

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557–58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

To sustain a conviction for aggravated assault, the state had to prove that the defendant "[i]ntentionally or knowingly cause[d] another to reasonably fear imminent bodily injury" and that the defendant "[u]se[d] or display[ed] a deadly weapon . . . ." Tenn. Code

Ann. §§ 39-13-101(a)(2), -102(a)(1)(B). A person acts intentionally when his conscious objective or desire is to engage in the conduct or cause the result. Tenn. Code Ann. § 39-11-106(a)(18). A person acts knowingly when he is aware of the nature of his conduct or that the circumstances exist or that he is aware that his conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-13-101(a)(20). Imminent danger is an immediate, real threat to one's safety. *See* Black's Law Dictionary (8th ed. 2004). A deadly weapon is anything made, designed, or used for the purpose of inflicting death or serious bodily injury. Tenn. Code Ann. § 39-11-106(a)(5)(A)-(B).

First, the defendant contends that he did not have the requisite intent to commit an assault, and his intent for displaying the knife was self-defense. To prevail on a claim of self-defense a defendant must show that he acted upon a well-founded apprehension of great bodily injury and that the actions he took were necessary. *State v. Wilson*, 556 S.W.2d 232, 243 (Tenn. 1977). We do not find such a showing in the present case. It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Whether the doctrine of self-defense justified the defendant's actions is a question of fact to be determined by the jury under proper instructions and from consideration of all the evidence. The jury is not obligated to accept the defendant's testimony as to self-defense. Here, the jury obviously rejected the defendant's self-defense theory, as was their prerogative. This court will not re-weigh or re-evaluate the evidence presented. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) *superseded by rule as state in State v. Moats*, 906 S.W.2d 431, 434 (Tenn. 1995). Thus, we conclude that this issue is without merit.

Next, the defendant asserts that Wright's fear was not imminent because he was not in the "zone of danger"; however, this court has declined to apply a zone of danger approach to aggravated assault. *See State v James Paris Johnson*, No. E2008-02555-CCA-R3-CD, 2010 WL 3565761, at *6 (Tenn. Crim. App., at Knoxville, September 15, 2010). In the present case, the evidence established at trial, viewed in the light most favorable to the state, reveals that the defendant got into an argument at the Night Deposit. Wright, a security guard at the Night Deposit, escorted the defendant outside to diffuse the altercation. The defendant was cursing and did not leave the premises after being escorted outside. When Wright told the defendant that he would call the police if the defendant did not leave the property, the defendant pulled out a knife. When Wright saw that the defendant still had not left the premises and once again asked him to leave, the defendant pulled out the knife a second time. Wright testified that he felt that the defendant, who was intoxicated and belligerent, posed a threat to himself and the customers who were entering and exiting the Night Deposit. A rational trier of fact could have found that the defendant intentionally or knowingly caused Wright to fear imminent bodily injury by displaying the knife twice. Accordingly, we conclude that the evidence was sufficient to sustain the defendant's conviction for aggravated assault.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the Montgomery County Circuit Court.

_____
THOMAS T. WOODALL, JUDGE